UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMON TINSLEY,

       Petitioner,                          Case Number: 05-CV-71203-DT
                                                         Honorable Nancy G. Edmunds

v.

KURT JONES,

       Respondent.
_____/

**OPINION AND ORDER DENYING**
**PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner, Damon Tinsley, a state inmate currently incarcerated at the Carson City Correctional Facility in Carson City, Michigan, has filed a *pro se* petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Petitioner was convicted of two counts of first-degree criminal sexual conduct and was sentenced to twenty-five to sixty years imprisonment. He is now challenging his state convictions and sentences on the following grounds: (1) prosecutorial misconduct, (2) other bad acts evidence, (3) ineffective assistance of both trial and appellate counsel and, (4) disproportionate sentencing. For the reasons stated below, the Court denies the petition.

**I. Procedural History**

      Petitioner was tried before a jury in the Livingston County Circuit Court, the Honorable Stanley J. Latreille, presiding. On February 11, 2002, he was sentenced to two concurrent terms of twenty-five to sixty years imprisonment.

Petitioner appealed as of right to the Michigan Court of Appeals, alleging the following:

    I.    Defendant Tinsley was denied his due process right to a fair trail when other bad acts evidence was admitted contrary to Mich.R.Evid. 404(b) where there was no proper purpose offered, no logical relevance, and the evidence was more prejudicial than probative.

    II.    The prosecutor violated Mr. Tinsley's state and federal constitutional due process rights to a fair trial by (1) improperly vouching for the complainant in closing argument, (2) injecting unfairly prejudicial innuendo by disparaging Mr. Tinsley and encouraging the jury to convict based not on guilt or innocence but rather on character, (3) eliciting unfairly prejudicial testimony from prosecution witnesses, and, (4) appealing to the "civic duty" of the jury.

    III.    The twenty-five to sixty years terms of imprisonment imposed in the case at bar for the first-degree criminal sexual conduct are disproportionate to the offenses and this offender and an abuse of sentencing discretion, despite being in accord with the judicial sentencing guidelines, where Mr. Tinsley is a forty-year-old first-time felony offender.

The Michigan Court of Appeals affirmed Petitioner's convictions on October 16, 2003. *People v. Tinsley*, No. 240160, 2003 WL 22359414 (Mich. Ct. App. Oct. 16, 2003). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, presenting the same claims. On April 30, 2004, the Michigan Supreme Court denied leave to appeal. *People v. Tinsley*, 470 Mich. 859; 680 N.W.2d 419 (2004).

Petitioner filed the pending petition for a writ of habeas corpus, raising the same claims as raised in both state appellate courts. Additionally, Petitioner raised ineffective assistance of both trial and appellate counsel claims, which were withdrawn in a letter to the Court, dated

November 17, 2005. The Court therefore does address those claims.

## II. Facts

Petitioner was convicted of two counts of first-degree criminal sexual conduct, MICH.COMP.LAWS 750.520b(1)(a), following a three-day jury trial in the Livingston County Circuit Court. The convictions stem from allegations by Petitioner's girlfriend's seventeen-year-old daughter, the complainant in this case.

Petitioner and his girlfriend lived together in a house with their son, and the complainant in this case, Alicia Collins ("Complainant"). It was the prosecution's theory that sometime in 1994, 1995, and 1996, when the complainant was in third, fourth, and fifth grades, Petitioner touched the complainant's vaginal area and twice placed his finger in her vaginal crease. It was Petitioner's theory that the complainant fabricated the allegations of abuse because she did not like Petitioner and wanted him out of the house.

According to the complainant's testimony, when she was in third grade, about nine or ten years old, Petitioner began calling her up to his bedroom. She testified that he would cuddle with her and tickle her. She said that it then progressed into more sexual things; he would tickle her inner thighs, rub her back and below her panties, and make her sit on his crotch area. The complainant testified that he would rub her stomach "right in the vagina area. His hand would be, you know, sometimes a finger or something would be in the crack or the crease of the vagina and that's as far as it ever got. There was no penetration." (Trial Tr. Vol. I, pp. 47-52.) The complainant testified that it occurred on a weekly basis, and went on until the end of her fifth-grade year in school. She said that it sometimes occurred when her mother and her younger

brother were in the house, but never in the bedroom.

The complainant testified that when she was in the fifth grade, she began spending a lot of time away from her home, trying to avoid going up to Petitioner's bedroom. She said that she told two friends what was happening but did not tell her mother because she was afraid of what Petitioner might do; the complainant testified that Petitioner yelled a lot.

According to the complainant's testimony, she, her mother, and her brother moved out of the house at the beginning of her ninth-grade year. Shortly after they moved out, the complainant's mother gave birth to a baby girl. This concerned the complainant because she was afraid that when her sister got a little older and Petitioner would babysit for her, the same thing would happen. She told her grandmother about what had occurred in Petitioner's bedroom because she was concerned for her little sister's safety. The grandmother then told the complainant's mother, who in turn called the police. The complainant's testimony revealed that she did not accuse Petitioner because she was angry with him. Rather, she did it because she wanted to prevent it from happening to her sister and to "get it off her chest." (Trial Tr. Vol. I, pp. 66-67.)

On cross-examination, the complainant testified that Petitioner was a father-figure and very much a father to her. She testified that Petitioner had moved out of the house for a period of time, and that it was for several months, but she did not remember that it had been for about a year and a half. The complainant testified that she felt safe when Petitioner was out of the house, and that she never told anyone about the abuse until she became scared for her little sister. She said that Petitioner touched her inappropriately many times, at least two times a week and well over one hundred times a year. She said that Petitioner never threatened her. She said that

sometimes her mother entered the room when she was there with Petitioner, but that she (her mother) did not see anything inappropriate. The complainant testified that Petitioner did not touch her breasts, did not hurt her, and that his finger never penetrated beyond the crease of her vagina.

The complainant's mother, Alana Collins ("Collins"), testified that she and Petitioner had a ten-year relationship during which time they had two children together. The complainant was not Petitioner's daughter. Collins said that Petitioner was strict with the children, and that he drank a lot and that there was quite a bit of tension in the house. She said that Petitioner was charged twice with domestic violence. Collins acknowledged that Petitioner would call the complainant and her brother to come to his bedroom and "cuddle" with him. Collins testified that Petitioner was arrested in 1994 for domestic violence and that he moved out of the house. She said that he was gone for about five or six months.

According to Collins' testimony, in 1999, she and her two children moved out of the house. In July of 2000, she gave birth to a daughter. She said that she continued to have contact with Petitioner, and that Petitioner had contact with their new-born daughter. According to Collins' testimony, the first time that Petitioner was suppose to babysit for their daughter is when she received a phone call from her mother, the complainant's grandmother, informing her about the complainant's sexual allegations against Petitioner. After receiving that phone call, Collins notified protective services and the police. The police came to the house and spoke both to the complainant and her mother.

During Collins' cross-examination, she acknowledged that there were several personal

protection orders issued against Petitioner. She also testified to the fact that Petitioner had moved out of the house for about six months. Collins admitted that the domestic violence was mutual; she would yell at Petitioner, push and shove him, and she said that she also may have hit him at one time. Collins testified that the complainant had expressed concern about the new baby being with Petitioner and that she was afraid of him. Collins said that the complainant would talk to her about the problems she was having with Petitioner; she even told her that Petitioner had put his hand down the back of her underwear and that she told him to stop. Collins testified that the complainant did not have any drastic ups and downs with her school grades.

Alicia Glenn ("Glenn"), a friend of the complainant's since third grade, testified that, while the complainant was visiting her at her house, she told her (Glenn) that the Petitioner had touched her sexually in places that she did not want to be touched. Glenn said that the complainant told her that she did not tell anyone else, and that she (the complainant) did not tell her mother because she thought that her mother would not believe her. On cross-examination, Glenn said that she was not aware that the complainant and Petitioner had a bad relationship. Glenn said that she had never met Petitioner.

Amber Spisz, the complainant's best friend, testified that the complainant had told her that Petitioner had put his hands down her pants and that she was afraid to tell her mother. Spisz said that she did not know Petitioner.

Michigan State Police Trooper D.J. Oswald-DeBottis ("Oswald-DeBottis") was assigned to the case. She interviewed the complainant, with her mother, the prosecutor, and individuals from the Family Independence Agency. Oswald-DeBottis and an officer from Green Oak

Township interviewed Petitioner at the state police post.

According to Oswald-DeBottis' testimony, Petitioner told her that he would call the complainant to come up to his bedroom to watch television with him. Petitioner told Oswald-DeBottis that they would lay on their backs and that the complainant would lay her head on his arm or place her legs over his lap and that he would rub her legs to help relieve the discomfort of her growing pains. Petitioner also told the officer that he would tickle her on her legs just above her knees; he said that he did not recall rubbing other parts of her body, but that he could have. Petitioner told the officer that he raised the complainant as if she was his own daughter. He would ask her and her brother for "sugar" and they would kiss on the lips to display affection. Petitioner told her that he never forced the children to kiss him. He denied that the complainant straddled his groin or that he placed his hands in her panties. It was Oswald-DeBottis' opinion that Petitioner was evasive during the interview; that he avoided having eye contact with her.

The defense presented one witness, Petitioner's stepbrother, Roy Tinsley. According to his testimony, Petitioner and the complainant had a normal, loving relationship. It was his testimony that Petitioner loved his children and that he never heard him yell at the complainant. Petitioner chose to exercise his Fifth Amendment right and did not testify.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's habeas corpus review of state court decisions. Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

> granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, *supra* at 407-08. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, *supra* at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable

8

application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, *supra* at 412.

### IV.  Analysis

### A.  Prosecutorial Misconduct Claim

Petitioner asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by (1) vouching for the complainant during closing argument, (2) improperly injecting prejudicial innuendos by disparaging Petitioner, (3) eliciting unfair prejudicial testimony from prosecution witnesses, in violation of Mich.R.Evid. 404(b) and, (4) appealing to the "civic duty" of the jury, thereby depriving Petitioner of his due process rights to a fair trial and an impartial jury.

Before habeas corpus relief becomes available, prosecutorial misconduct must be so egregious as to deny the petitioner a fundamentally fair trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Specifically, the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused." *Hamblin v. Mitchell*, 354 F.3d 484, 494-95 (6th Cir. 2003). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

9

The inquiry in this case is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established federal law. *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S.Ct. 1825 (2004); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions). The giving of cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, *supra* at 1356. Extensive prosecutorial misconduct during trial and during closing argument justifies the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

However, where the evidence pointing to the defendant's guilt is strong and the prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's guilt or innocence of the crime, the improper comments may be "error, but the jury would probably have returned the verdict of guilty anyway," and habeas relief is not warranted. *Hamblin*, *supra* at 495.

The Sixth Circuit has adopted a two-step approach in order to determine whether a defendant is entitled to a new trial based upon improper prosecutorial remarks made in closing argument. *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994). First, the court should determine whether the remarks were improper by examining the context of the remarks and existing precedent. *Id.* at 1387-89. Second, it should determine whether the remarks were flagrant by applying the factors enunciated in *United States v. Leon*, 534 F.2d 667, 678-83 (6th

10

Cir. 1976).

> Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused."

*Id. See also Boyle*, *supra* at 717 (quoting *Carroll*, *supra* at 549, 550). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

### 1. Impermissibly vouching for the complainant; Disparaging comments toward Petitioner; Appealing to the "civic duty" of the jury

Petitioner contends that during closing arguments, the prosecutor told the jury that she believed that the complainant was an "honest" girl who told her story "the way it was," thus, impermissibly vouching for the complainant. (Trial Tr. Vol. II, p. 232.) The prosecutor stated:

> You saw her come into this Courtroom. You saw her testimony. You have the ability to judge her and judge whether you think she is being honest and I submit to you, ladies and gentlemen that all of the evidence that has been presented during the course of this trial has indicated that this young lady was very honest in telling you about how she was a victim of sexual molestation when she was in the third, fourth and fifth grades.

(Trial Tr. Vol. II, p. 221.)

* * *

> That was the motivation and if the motivation was, as Ms. Reader [defense counsel] wants you to believe, well, maybe they were going to get back together and maybe she just wanted to get at him so that wouldn't happen, then why, ladies and gentlemen, why before that ever happened, did she tell her friends, Alicia and Amber, that she had been touched

11

> improperly by Damon Tinsley? The answer to that question, ladies
> and gentlemen, is because she is telling you the way it was.

(Trial Tr. Vol. II, p. 232.)

It is also Petitioner's contention that during closing arguments, the prosecutor's statements encouraged the jury to convict him because of his character. The prosecutor stated:

> You have heard what a controlling person Damon Tinsley is. You
> have heard that it's usually Damon's way or else and it seems to
> have been that way in his business life, as testified to by his
> brother and it was that way with the children that lived in that
> house and if things didn't go Damon's way, then there would be
> yelling and that would escalate sometimes to violence, domestic
> violence for which you have heard, there was even, in fact, a
> conviction in Court for that violence. So, it's not all that hard to
> understand, ladies and gentlemen, why a little girl who is ten,
> eleven and twelve makes the decision to keep it secret, as opposed
> to facing the wrath and facing the violence that could ensue if she
> were to tell, especially while she was living in that house.

(Trial Tr. Vol. II, p. 223.)

* * *

> Well, you know what? He was mean tempered. He was mean
> tempered. He did commit domestic violence against his wife. He
> did make things in that house miserable. It was Damon's way or
> no way. Damon had his way with Alicia and she knew it was a
> situation, knew it was a situation, where if worse comes to worse,
> he shouts and rants and he can make a situation go away because
> Damon is the kind of person who wants to control things. So, you
> know what? It's not unusual for kids not to tell. It's not that
> unusual and it doesn't mean they're lying. It doesn't mean they're
> lying. Alicia didn't tell because she knew the ramifications
> because Damon Tinsley was a mean, violent man and to tell could
> have possibly brought that back and not knowing how people were
> going to react to the situation, she didn't tell.

(Trial Tr. Vol. II, p. 233.)

* * *

> You need to look at the environment in which she was raised, the environment where you had to walk on eggshells, the environment in which failing to do so would draw the wrath and the violence of Damon Tinsley.

(Trial Tr. Vol. II, p. 234.)

Finally, Petitioner argues that the prosecutor's final statement in closing arguments was so inflammatory that he was deprived of his right to a fair trial. The prosecutor stated:

> I'd ask, ladies and gentlemen, that you go back to that jury room, that you look at that evidence so carefully and I'm asking that you do one thing in this case and that is that you do justice and in this case, ladies and gentlemen, a verdict of guilty and justice are the same thing.

(Trial Tr. Vol. II, p. 235.)

Here, the Michigan Court of Appeals, the last court to issued a reasoned decision in this case, did not find the prosecutor's conduct "so egregious as to deny petitioner a fundamentally fair trial." *Donnelly*, *supra* at 637, 643-45. That court stated in pertinent part:

> Next, defendant argues that the prosecutor deprived him of a fair trial by making improper comments to the jury. We disagree. Defendant failed to object to any of the statements he now cites as improper. A defendant's failure to timely and specifically object to improper prosecutorial comments forfeits the issue's review unless an objection and cautioning instruction could not have cured the subsequent prejudice or our failure to review the issue would result in a miscarriage of justice. *People v. Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994).
>
> Our resolution of defendant's first issue forecloses any finding that the prosecutor committed misconduct when it presented and argued other-acts evidence. We also disagree with defendant's arguments that the prosecutor denied him a fair trial by improperly vouching for the victim, disparaging defendant, and appealing to the jury's civic duty. A prosecutor need not argue the least prejudicial evidence or state inferences in the blandest terms. *People v Aldrich*, 246 Mich App 101, 112; 631 NW2d 67 (2001). In context, the

13

> vouching comments defendant cites refer directly to relevant evidence and do not invoke reliance on the prosecutor's status, personal opinion, or knowledge of verifying facts withheld from the jury, so no impermissible vouching occurred. *People v Knapp*, 244 Mich App 361, 382; 624 NW2d 227 (2001). Likewise, the prosecutor's arguments regarding defendant's overbearing demeanor referred directly to presented evidence. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Finally, the prosecutor's brief comment urging the jury to "do justice" followed a lengthy summary of the evidence and the prosecutor's repeated request that the jury closely examine the evidence, so the prosecutor likely dissipated any unfair prejudice the comment created. *People v Bass (On Rehearing)*, 223 Mich App 241, 251;565 NW2d 897 (1997), vacated in part on other grounds, 457 Mich 866 (1998). Because defendant failed to demonstrate a miscarriage of justice or incurable prejudice, the prosecutor's comments do not require review. *People v Messenger*, 221 Mich App 171, 177; 561 NW2d 463 (1997).

*Tinsley*, *supra*, slip op. at 2.

The Michigan Court of Appeals in this case found no error in the instances of alleged prosecutorial misconduct outlined by Petitioner. This Court agrees and finds that decision is consistent with United States Supreme Court precedent and constitutes a reasonable application thereof. The prosecutor accurately stated his role in representing the State of Michigan.

Although a prosecutor may not vouch for the credibility of a witness by implying that he or she has some special knowledge concerning the witness' truthfulness, any such references by the prosecutor in this case, even if erroneous, were not so flagrant as to warrant habeas relief.

Applying the *Carroll* test, as to the first factor, the trial court instructed the jury that the attorney's arguments were not evidence. The jury could not have been misled. Petitioner's

claim does not satisfy the second factor because the statements were isolated, made only briefly in closing argument and were unlikely to influence the jury. The alleged vouching and civic duty comments were directly relevant to the case. Finally, the evidence against Petitioner, in the form of the complainant's statement, was strong.

Therefore, under the circumstances of this case, the prosecutor's conduct was not so egregious or flagrant as to deprive Petitioner of a fair trial. Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

### B. Other Acts Evidence

Petitioner next argues that the trial court erred when it allowed the prosecutor to introduce other-acts evidence regarding identical contemporaneous episodes of sexual contact with the complainant and Petitioner's propensity for violence. The Michigan Court of Appeals, the last court to issue a reasoned decision found that, because there was no objection to the introduction of the evidence, Petitioner forfeited this issue. The state appellate court nevertheless reviewed the claim for plain error. The state appellate court stated in pertinent part:

> Defendant first argues that the trial court erred when it allowed the prosecutor to introduce other-acts evidence regarding identical contemporaneous episodes of sexual contact with the victim and defendant's propensity for violence. We disagree. Because defendant failed to object to the introduction of this evidence, he forfeited this issue. *People v Carines*, 460 Mich 750, 761; 597 NW2d 130 (1999). Therefore, we will only review the issue if defendant demonstrates plain error that affected his substantial rights. *Id.* at 763-764. Defendant's claim of error regarding contemporaneous sexual contacts does not merit our review, because the evidence fits squarely within MRE 404(b)(1)'s "scheme, plan, or system" exception. See *People v Sabin (After*

15

> *Remand)*, 463 Mich 43, 63-65; 614 NW2d 888 (2000).  Also, the
> evidence regarding defendant's hostility explained the victim's
> prolonged silence, which defendant used to attack her credibility.
> Therefore, MRE 402 permitted the prosecutor's use of the relevant
> evidence, and the trial court did not commit plain error by allowing
> the jury to consider it.  Further, defendant also presented his own
> potent evidence of his violent behavior to further his strategic
> suggestion that the victim concocted the sexual-contact allegations
> to free herself from defendant's strict supervision.  Therefore, the
> prosecutor's presentation of similar evidence did not adversely
> affect defendant's substantial rights.

*Tinsley*, *supra*, slip op. at 1-2.

      Concerning the Rule 404(b) evidence, the introduction of the evidence *per se* is a matter of state law which may not be reviewed by a habeas court.  An issue regarding the admissibility of evidence or error in state procedure does not rise to a level of constitutional magnitude unless it can be viewed as so egregious that the petitioner was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 125 S.Ct. 126 (2004).  To determine whether the admission or inadmissibility of evidence has denied a defendant's fundamental due process rights, the court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness."  *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001).

      The Sixth Circuit has specifically upheld state convictions against similar habeas challenges involving Rule 404(b) evidence on the ground that the use of such evidence in those cases was not fundamentally unfair.  *See Burton v. Renico*, 391 F.3d 764, 773-775 (6th Cir. 2004); *Coleman v. Mitchell*, 244 F.3d 533, 542-543 (6th Cir. 2001).  The same conclusion is warranted in this instance.

      The Michigan Court of Appeals, in reviewing Petitioner's claim for plain error held that

Petitioner opened the door to testimony regarding his character when he introduced evidence suggesting that the complainant concocted the allegations because she wanted to free herself from his strict supervision.  With the door open, the prosecutor was then able to introduce the other-acts evidence regarding prior sexual episodes with the complainant and his propensity for violence.  The Michigan Court of Appeals' holding as to the introduction of the 404(b) evidence was not contrary to, or an unreasonable application of, clearly established federal law so as to entitle Petitioner to habeas relief.  As such, Petitioner is not entitled to habeas relief on this claim.

### C.  Sentencing Claim

In his final claim, Petitioner alleges that his sentence of twenty to sixty years imprisonment was disproportional and constitutes an abuse of discretion by the trial court.  To the extent that Petitioner argues that his sentence is disproportionate under state law, he has failed to state a claim for federal habeas relief.  *See Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000).

A sentence imposed within the statutory limits is not generally subject to habeas review. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F.Supp.2d 788, 797 (E.D. Mich. 1999).  Generally, federal habeas review of a state-court sentence ends once the court makes a determination that the sentence is within the limitation set by statute.  *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000).  Because the Michigan Court of Appeals, the last court to issue a reasoned decision regarding this claim, found that Petitioner's sentence was within the bounds set by statute, this Court will not disturb the sentence on habeas review.  *Id.*  That court stated in pertinent part:

> Finally, defendant argues that the trial court disproportionately sentenced him to 25 to 60 years in prison. We disagree. In this case, the judicial sentencing guidelines apply because the offenses occurred before January 1, 1999. *People v Reynolds*, 240 Mich App 250, 254; 611 NW2d 316 (2000). Here, defendant's sentence falls within the guidelines, so it is presumed proportionate. *People v Kennebrew*, 220 Mich App 601, 609; 560 NW2d 354 (1996). Defendant's age and lack of criminal history fall short of sufficient "unusual circumstances" to overcome the presumption of proportionality. See *People v Milbourn*, 435 Mich 630, 661; 461 NW2d 1 (1990). On the other hand, the trial court could properly consider that defendant molested the victim weekly over a period of four years and used actual and threatened domestic violence to hide and perpetuate his conduct. *People v Compagnari*, 233 Mich App 233, 236; 590 NW2d 302 (1998). In light of this evidence, defendant fails to demonstrate that his sentence was disproportionate. *Kennebrew*, *supra* 607-608.

The United States Constitution does not require that sentences be proportionate. In *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991), a plurality of the United States Supreme Court concluded that the Eighth Amendment does not contain a requirement of strict proportionality between the crime and the sentence. The Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime. *Id.* at 1001.

Successful challenges to the proportionality of a particular sentence in non-capital cases are "exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980). Federal courts will therefore not engage in a proportionality analysis except where the sentence imposed is death or life imprisonment without parole. *See Seeger v. Straub*, 29 F.Supp.2d 385, 392 (E.D. Mich. 1998). A claim that a sentence is imposed in violation of Michigan's sentencing law does not state a claim for relief in a habeas proceeding where there is no claim that the sentence violates the cruel and unusual punishment clause of the Eighth Amendment. *Hanks v. Jackson*, 123 F.Supp.2d 1061, 1075 (E.D. Mich. 2000).

Here, the state appellate court found that Petitioner's sentence was not disproportionate. That decision is not contrary to, or an unreasonable application of, federal law or Supreme Court precedent. Therefore, Petitioner is not entitled to habeas relief on this claim.

### D. Ineffective assistance of counsel claims

On November 17, 2005, in a letter to this Court, Petitioner withdrew both his trial and appellate ineffective assistance claims, as those claims were unexhausted. Therefore, the Court will not address those claims.

### V. Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: February 27, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 27, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

19